ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN - 8 2010

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| JEROMY MICHAEL JOLLEY,<br>　　　　Petitioner,<br><br>v.<br><br>RICK THALER, Director,<br>Texas Department of Criminal Justice,<br>Correctional Institutions Division,<br>　　　　Respondent | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§    Civil Action No. 4:09-CV-594-Y |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE AND NOTICE AND ORDER

This cause of action was referred to the United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b), as implemented by an order of the United States District Court for the Northern District of Texas. The Findings, Conclusions, and Recommendation of the United States Magistrate Judge are as follows:

### I. FINDINGS AND CONCLUSIONS

#### A. NATURE OF THE CASE

This is a petition for writ of habeas corpus by a state prisoner under 28 U.S.C. § 2254.

#### B. PARTIES

Petitioner Jeromy Michael Jolley, TDCJ-ID #1266615, is in custody of the Texas Department of Criminal Justice, Correctional Institutions Division, in New Boston, Texas.

Respondent Rick Thaler is the Director of the Texas Department of Criminal Justice, Correctional Institutions Division.

## C. Factual and Procedural History

On October 14, 2004, a jury convicted Jolley of murder and sentenced him to 75 years' imprisonment in the Criminal District Court Number Two of Tarrant County, Texas. (Clerk's R. 289) Jolley appealed, but the appellate court affirmed the trial court's judgment, the Texas Court of Criminal Appeals refused Jolley's petition for discretionary review, and the Supreme Court denied his petition for a writ of certiorari. *Jolley v. Texas*, No. 2-04-503-CR, slip op., 2006 WL 176730 (Tex. App.–Fort Worth Jan. 26, 2006) (not designated for publication); *Jolley v. Texas*, PDR No. 566-06; *Jolley v. Texas*, 549 U.S. 1126 (2007). Jolley also sought postconviction state habeas relief, to no avail. *Ex parte Jolley*, State Habeas Appl. No. WR-72,221-01, at cover. This federal petition followed.

The state appellate court, distinguishing between the accomplice witness testimony of Brian Taylor and non-accomplice witness testimony, set forth the factual background of the case as follows:

### A. Accomplice Witness Testimony

> Brian Taylor testified that on the night of July 31, 2003, he partied with his girlfriend and eventually drove her home in her car. Taylor paged Jolley, and Jolley followed the couple in his truck to Taylor's girlfriend's home. Taylor then joined Jolley in Jolley's truck, and they went to run an errand.
>
> As Jolley drove, he asked Taylor if he wanted to smoke a blunt [a cigar hollowed out and filled with marijuana] and handed Taylor a bag of marijuana. Jolley was driving on Interstate 820, and Taylor was about to start making the blunt when Jolley's truck hit the rear of a Chevy pickup traveling in front of them. Taylor heard the brakes squeal and put out his hand in front of his head; Taylor's hand and head cracked Jolley's windshield. Jolley's truck died and coasted to the left-hand shoulder of the road. Taylor said that Jolley tried unsuccessfully to restart the truck so that they could leave because they were both under the influence of alcohol. Taylor described Jolley as "very mad."

2

When Jolley's truck would not start, Taylor and Jolley got out and approached the driver's side window of the other pickup. Jolley and the driver of the other vehicle–Juan Gallegos–began yelling at each other about who was at fault for the accident. Jolley yelled that Mr. Gallegos had "brake-checked" him, and Mr. Gallegos said that the wreck was Jolley's fault because he had been driving too fast. Jolley then opened the door of Mr. Gallegos's truck, and he and Taylor punched Mr. Gallegos. Eventually, Taylor stepped back, but Jolley leaned almost all the way inside the truck and continued to strike Mr. Gallegos.

Mr. Gallegos exited his truck through the passenger side door and ran away. Taylor commented that Mr. Gallegos did not appear to be mortally wounded because he saw Mr. Gallegos jump over a guard rail and hurry down an embankment. Taylor did not notice blood on Mr. Gallegos, but the 5 a.m. darkness limited visibility. At that time, Taylor did not know that Mr. Gallegos had been stabbed.

Jolley's truck still would not start, so Jolley got in Mr. Gallegos's truck, Taylor got in Jolley's truck, and Jolley pushed his truck with Mr. Gallegos's truck while Taylor steered. Taylor called Jeff Feaster and Kenny Gabel, who owned a nearby mechanic's shop, to get them to unlock the shop so that Jolley could park his truck there out of view. Jolley and Taylor successfully pushed Jolley's truck to the mechanic's shop. Either right before they left the accident scene or right after they arrived at the shop, Jolley told Taylor that he–Jolley– had stabbed Mr. Gallegos. Taylor asked where and how many times Jolley had stabbed Mr. Gallegos, and Jolley demonstrated the locations where he had stabbed Mr. Gallegos by patting Taylor's left side from his knee to his armpit. Jolley did not say what he had used to stab Mr. Gallegos; Taylor assumed that Jolley had used a knife that he always carried.

Taylor knew that the Haltom City Police Department patrolled the area surrounding the mechanic's shop, so he drove Mr. Gallegos's truck some distance away and drove it into a ravine. After Taylor disposed of Mr. Gallego's truck, he returned to the shop. By that time, Gabel had unlocked the shop, and Gabel, Cody Clanton, Little Ronnie, and two other men were at the shop. According to Taylor, Jolley broke the blade off of Jolley's knife and threw the blade towards some weeds outside the shop. Taylor notice blood on his knuckles and went to wash his hands. When he returned, Jolley and Clanton had left the shop.

That evening, Taylor, Jolley, and Jolley's girlfriend Mary were all at Feaster's and Gabel's apartment. Ultimately it was decided that Mr. Gallegos's truck should be burned to eliminate any fingerprints. Taylor, Jolley, and Mary went together to purchase gas and to locate Mr. Gallegos's truck but decided not to burn it that night because they were worried about being seen by people outside at a nearby house. The next day, Jolley attempted unsuccessfully to find the truck on his own to burn it. He called Taylor, and Taylor helped him locate Mr. Gallegos's truck.

3

Taylor testified that he did not stab Mr. Gallegos, that he had never said that he had stabbed Mr. Gallegos, that Jolley had never accused him of stabbing Mr. Gallegos, and that he did not intend for Mr. Gallegos to be seriously injured.

### B.   Non-Accomplice Witness Testimony

On August 1, 2003, a truck driver discovered a man lying on the side of the road near some restaurants. The truck driver could tell that the man had been stabbed and called 911. Paramedics arrived and confirmed that the man was dead.

Robert Presney, the crime scene officer, testified that no weapon or cell phone was found at the scene. Detective Sarah Jane Waters testified that after the medical investigator arrived, police were able to move the body, to go through the man's pockets, to locate his driver's license, and to identify the man as Mr. Gallegos.

Several days later, Detective Waters received a call that police had located Mr. Gallegos's truck; it had been driven into a ravine and burned. She obtained records of Mr. Gallegos's cell phone calls and noticed a 911 call made on August 1, 2003, at 5:15 a.m. She obtained a tape of the 911 call from Haltom City and cleaned the tape to remove static and background noise. But she was still unable to determine the identity of the persons other than Mr. Gallegos whose voices were on the tape, so she decided to release the tape to the media in the hope of obtaining additional information about Mr. Gallegos's death. After the media published the tape of Mr. Gallegos's 911 call, tips came in mentioning several suspects, including Jolley and Taylor. Detective Waters spoke with several individuals who had discussed the offense with Taylor, and the information she gathered indicated that Jolley was the aggressor in the incident with Mr. Gallegos. Approximately seven months later, police located a knife handle on the roof of a shop near Feaster's mechanic shop.

Kenny Gabel testified that in 2003 he owned a mechanic's shop with and shared an apartment with Jeff Feaster. Gabel knew Jolley through Taylor. Gabel said that Taylor called him at 5:24 a.m. on August 1, 2003, and asked him to come back to the shop and to open it. When Gabel arrived at the shop, Taylor and Jolley were already there. Gabel saw Jolley's black Nissan truck pulled up to the shop's bay door. When Gabel realized that he did not have the key to the shop, Taylor became hysterical, saying that he needed to put Jolley's truck in the shop and could not leave it outside because they had been involved in an accident. Gabel learned that Taylor initially spoke with Mr. Gallegos after the accident and that there was an argument regarding who was at fault. Jolley came over and joined the argument. Gabel heard Jolley and Taylor say that they saw Mr. Gallegos lean over and that it looked like he might be grabbing a weapon. At that point, Taylor told Jolley to "get him." Taylor and Jolley reached into the pickup to stop Mr. Gallegos; Jolley pulled his pocket knife and stabbed Mr. Gallegos a couple of times in the leg. After being

stabbed, Mr. Gallegos got out of the truck through the passenger door and ran away. As Jolley was talking about the stabbing, he showed Gabel some blood on his wrist and on his watch. During this conversation, neither Taylor nor Jolley indicated that Mr. Gallegos had been killed. About four or five days after the accident, Gabel learned that Mr. Gallegos had died.

Cody Clanton, Jolley's best friend since first grade, testified that on July 31, 2003, he, Jolley, a friend named Derrick Bowman, and others were partying at Brian Picken's house. Clanton did not realize that Jolley had left Picken's house until Bowman received a call at 5:42 a.m. from Jolley. In response to the call, Clanton and Bowman went to Gabel and Feaster's mechanic shop. When they arrived at about 6 a.m., Clanton saw that Gabel, Jolley, and Taylor were already at the shop. Clanton noticed that Taylor had blood on his arms. Clanton also noticed that Jolley had blood on his arms and shirt and that his Nissan truck's front end was mangled.

Jolley wanted to leave and go to his grandmother's house, and Clanton drove him there. During the drive, Jolley talked to Clanton about the events from the early morning of August 1, 2002. Jolley told Clanton that he had picked up Taylor from Taylor's girlfriend's house and that they got on Interstate 820 to go back to a party. Jolley said that when he looked down to check Taylor's progress in making the blunt, he had an accident with Mr. Gallegos. Jolley said that Mr. Gallegos had "brake-checked" him and that he had hit Mr. Gallegos. Jolley said that when he and Taylor got out of his truck, Mr. Gallegos was already on the phone dialing 911. Taylor said, "[L]et's get him," got on top of Mr. Gallegos, pinned Mr. Gallegos, and punched him. Jolley said that he approached Mr. Gallegos's truck with his own pocket knife drawn and started stabbing Mr. Gallegos. Jolley said that Mr. Gallegos fled the truck through the passenger side door and ran across the highway. Jolley's truck would not start, so Jolley used Mr. Gallegos's truck to push it–with Taylor steering–to the shop. Jolley said he destroyed his knife by opening the driver's door and grinding the blade on the concrete. He said that he threw the knife handle on top of a nearby shop.

On the night of August 1, 2003, Clanton and Jolley went to Taylor's house, and Jolley asked Taylor where he had "ditched" Mr. Gallegos's truck. Taylor provided a description of the truck's location, and Clanton and Jolley went to find it. They could not find the truck and stopped looking for it at approximately 1 a.m. During the drive back to Jolley's grandmother's house, Jolley tried out different alibis on Clanton; Clanton described them as a "[cockamanie] scheme that [Jolley] tries to put on to somebody else." For instance, Jolley said that Taylor was the stabber because Jolley is left-handed and because Mr. Gallegos's stab wounds were on the left side.

Jolley called Clanton on August 3, 2002. Jolley wanted to obtain a better description of the truck's location from Taylor. Jolley said that he, Mary, and

5

Bowman had unsuccessfully looked for the truck the previous day. Eventually, Clanton, Jolley, and Taylor loaded up Taylor's motorcycle and drove to an area near the shop; Taylor used his motorcycle to take Jolley to the truck. Clanton and Jolley left and purchased some gas; afterwards, Clanton set the truck on fire. After the truck had been burned, Jolley told some people that the evidence was gone and said that he wanted to plant one of his guns in the burned truck so it appeared he stabbed Mr. Gallegos in self defense after Mr. Gallegos pulled a gun.

Clanton said that he and Jolley separately heard the 911 tape. Jolley told Clanton that he could hear Taylor's voice on the tape saying, "Let's get him." Clanton heard Jolley saying, "You brake-checked me," and Jolley admitted to Clanton that the voice was his. Clanton agreed that, because of the media coverage, he knew that Mr. Gallegos had died before he set Mr. Gallegos's truck on fire.

Dr. Daniel Konzelmann, a Deputy Medical Examiner in the Tarrant County Medical Examiner's Office, testified that he performed the autopsy on Mr. Gallegos. Dr. Konzelmann noted sharp-force injuries to Mr. Gallegos's left chest, left abdomen or belly, left lower arm, and left thigh and leg; he also noted some scrapes on the face and the right knee. Dr. Konzelmann stated that none of the wounds to the head were life threatening; the wound to the left upper chest was not fatal in and of itself; the wound to the heart (described as wound number two in the report and in his testimony) was fatal and was the most important wound; and with proper medical care, the wound to the left lower chest (described as wound number three in the report and in his testimony) at the costal margin might be survivable. Overall, wound numbers two and three were the most immediate and life threatening. Dr. Konzelmann said that the wounds appeared to be knifelike. He concluded that the cause of death was sharp-force wounds and that the manner of death was homicide.

*Gallegos*, No. 2-04-503, slip copy, at 2-11, 2006 WL 176730, at **1-4 (footnotes omitted).

### D. ISSUES

In four grounds, Jolley claims (1) the trial court failed to properly charge the jury on accomplice-witness testimony, (2) the trial court failed to charge the jury on lesser included offenses, (3) the evidence is insufficient to support his conviction, and (4) he received ineffective assistance of trial counsel. (Pet. at 7-7I & 8)

### E. RULE 5 STATEMENT

Thaler believes Jolley has failed to exhaust his state court remedies as to one or more of his claims, but Thaler admits the petition was timely filed and is not successive. (Resp's Answer at 9)

### F. DISCUSSION

#### *Legal Standard for Granting Habeas Corpus Relief*

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless he shows that the prior adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court. 28 U.S.C. § 2254(d). A decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court of the United States on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

The Act further requires that federal courts give great deference to a state court's factual findings. *Hill*, 210 F.3d at 485. Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. 28 U.S.C. § 2254(e)(1). Thus, factual determinations by a state court are presumed correct absent clear and convincing evidence to the contrary, and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of

the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(2), (e); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams*, 529 U.S. at 399. The applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Typically, when the Texas Court of Criminal Appeals denies relief in a state habeas corpus application without written opinion, it is an adjudication on the merits, which is entitled to this presumption. *See Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997).

### *(1) and (2) Trial Court Error*

Jolley claims the trial court violated his right to due process by failing to properly charge the jury on Texas's accomplice-witness rule regarding the trial testimony of Taylor. (Petition at 7, 7A-7B) Under state law, an accomplice is an individual who participates with a defendant in the commission of a crime by doing some affirmative act with the requisite culpable mental state that promotes the commission of that offense. *Cocke v. State,* 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). A defendant cannot be convicted upon the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant to the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). A witness may be an accomplice either as a matter of law or as a matter of fact. *Cocke,* 201 S.W.3d at 747.

In Jolley's case, the jury was instructed on the issue of whether Taylor was an accomplice as a matter of fact. Specifically, the jury was instructed as follows:

> You are further instructed that a conviction cannot be had upon the testimony of an accomplice unless the jury first believes that the accomplice's evidence is true and that is shows the Defendant is guilty of the offense charged against him, and even then you cannot convict unless the accomplice's testimony is corroborated by other evidence tending to connect the Defendant with the offense charged against him. The

> corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the Defendant with its commission.
>
> Now, if you believe from the evidence beyond a reasonable doubt that an offense was committed and you further believe from the evidence that the witness, Brian Taylor, was an accomplice, or you have a reasonable doubt whether he was or not, as that term is defined in the foregoing instructions, then you cannot convict Defendant upon the testimony of said Brian Taylor unless you first believe that the testimony of the said Brian Taylor is true and that it shows that the Defendant is guilty as charged in the indictment; and even then you cannot convict the Defendant unless you further believe that there is other evidence in the case, outside the evidence of said Brian Taylor tending to connect the Defendant with the commission of the offense charged in the indictment, and then from all the evidence you must believe beyond a reasonable doubt that the Defendant is guilty.

(Clerk's R. at 269-70) Jolley did not request that the jury be instructed on the definition of "accomplice" or that Taylor was an accomplice as a matter of law or object to the charge on this ground. (State Habeas R. at 322-33)

The state habeas court considered this issue and determined the trial court properly instructed the jury that accomplice witness testimony must be corroborated, and, although the trial court should have defined "accomplice" for the jury, Jolley had failed to prove harm–*i.e.,* that the jury would have found him not guilty if it had received such an instruction, that the jury did not find that Brian Taylor was an accomplice, or that any error in not defining "accomplice" when charging the jury on "accomplice as a matter of fact" attributed to his conviction or punishment. (State Habeas R. at 343)

Jolley has not identified any federal legal authority, either constitutional in nature or otherwise, which purports to recognize a federal right to have a criminal jury instructed on a testifying witness's status as an accomplice, and none is found. Nor has he demonstrated that the omission of such an instruction by itself so infected the entire trial as to render the trial fundamentally unfair. *Henderson v. Kibbe,* 431 U.S. 145, 154-55 (1977); *Cupp v. Naughten,* 414

9

U.S. 141, 147 (1973); *see also Galvan v. Cockrell,* 293 F.3d 760, 764 (5th Cir. 2002) (relevant inquiry on claims of improper or rejected jury instructions is whether there was prejudice of constitutional magnitude).

Jolley also claims the trial court violated his right to due process by failing to charge the jury on lesser included offenses. The state habeas court considered this issue and determined that, under state law, a trial court is not required to submit a lesser included offense instruction *sua sponte* if neither side requests such an instruction, and in Jolley's case there was no evidence in the record that either party requested one. (State Habeas R. at 343) Nevertheless, the Fifth Circuit has repeatedly held that there is no federal constitutional right to an instruction on a lesser included offense in a noncapital state trial. *Creel v. Johnson,* 162 F.3d 385, 390 (5th Cir. 1998); *Valles v. Lynaugh,* 835 F.2d 126, 127 (5th Cir. 1988); *Alexander v. McCotter,* 775 F.2d 595, 601 (5th Cir. 1985); *Easter v. Estelle,* 609 F.2d 756, 758 (5th Cir. 1980).

### (3) *Sufficiency of the Evidence*

Jolley claims the evidence was insufficient to show that he intended to cause the death of the victim because the non-accomplice testimony established that Jolley made a statement that he stabbed the victim twice in the leg, accomplice Brian Taylor testified that Jolley was positioned at the legs of the victim and that he never saw Jolley with a knife, the medical examiner testified that there could have been two different knives used and that the one used to puncture the heart may not be same as the one used to puncture the leg, and the 911 tape recording established that it was Taylor's voice and "inferred" that Taylor was stabbing the victim.[1] (Petition at 7, 7B)

---

[1] Thaler claims Jolley's insufficiency of the evidence claim has not been exhausted in state court, however, notwithstanding a petitioner's failure to exhaust his state court remedies as to the claim(s) raised, a federal court may deny a petition on the merits. 28 U.S.C. § 2254(2).

The state appellate court, setting forth the standards for reviewing the legal sufficiency of the evidence under *Jackson v. Virginia*, the factual sufficiency of the evidence under state law, and the sufficiency of the evidence for corroborating accomplice-witness testimony under article 38.14 of the Texas Code of Criminal Procedure, addressed the issue as follows:

> We begin our analysis by determining whether the State met its burden under article 38.14 to offer non-accomplice witness evidence tending to connect Jolley with the offense. Under the requirements of article 38.14, we eliminate from our analysis of the evidence the evidence offered by the accomplice witness, here Taylor, and examine the other evidence to determine if there is sufficient corroborating evidence tending to connect Jolley to the commission of Mr. Gallegos's murder.
>
> Although none of the non-accomplice witnesses testified that Jolley stabbed Mr. Gallegos in the chest area where the fatal wound was inflicted, the record reveals that numerous non-accomplice witnesses testified that Jolley admitted to the stabbing. Gabel testified that Jolley said he pulled out his own pocket knife and stabbed Mr. Gallegos a couple of times in the leg. Clanton, who likewise obtained his information from Jolley, testified that Jolley stabbed Mr. Gallegos two times in the leg with Jolley's own pocket knife. Clanton also testified that Jolley said that he threw the handle of the knife on the top of the shops.
>
> The non-accomplice witnesses also testified that they never heard that Taylor stabbed Mr. Gallegos. Non-accomplice witness testimony likewise confirmed that the knife handle found on the roof of a shop near the mechanic's shop was similar to the one owned by Jolley and was found in the location where Clanton testified that Jolley had disposed of it. Non-accomplice witness testimony also existed that Jolley made up the story that Mr. Gallegos was armed.
>
> Excluding Taylor's testimony, as mandated by article 38.14, the remaining evidence sufficiently corroborates Taylor's accomplice witness testimony and satisfies the requirements of article 38.14. We hold that Taylor's accomplice witness testimony was sufficiently corroborated.
>
> We now analyze Jolley's claims that the evidence is legally and factually insufficient to establish that he stabbed Mr. Gallegos in the chest, intended to cause Mr. Gallegos's death, or intentionally committed an act clearly dangerous to human life. We consider all of the evidence-including Taylor's sufficiently corroborated accomplice witness testimony. The jury was charged that it could find Jolley guilty (1) if he intentionally or knowingly caused Mr. Gallegos's death by stabbing him

with a knife, (2) if he intentionally, with the intent to cause serious bodily injury to Mr. Gallegos, stabbed him with a knife, causing Mr. Gallegos's death, or (3) if, under the law of parties, he assisted Taylor to commit the offense.

Taylor's corroborated accomplice witness testimony is legally and factually sufficient to establish that Jolley stabbed Mr. Gallegos in the chest with the requisite intent. Taylor testified, and the jury was free to believe that, in response to Taylor's question about where Jolley stabbed Mr. Gallegos, Jolley patted Taylor all the way up his left side from above the knees to the armpit. Additionally, several of Jolley and Taylor's acquaintances testified that Jolley admitted that he used his knife and that he stabbed Mr. Gallegos. The acquaintances testified that Jolley never claimed that Taylor stabbed Mr. Gallegos.

Viewing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Furthermore, viewing all the evidence in a neutral light, favoring neither party, we conclude that evidence exists supporting the elements necessary for the jury to find Jolley guilty of murder. Evidence supporting the verdict, taken alone, is not too weak to support the finding of guilt beyond a reasonable doubt, and the contrary evidence is not so strong that guilt cannot be proven beyond a reasonable doubt.

*Jolley*, slip copy, at 12-20, 2006 WL 176730, at **5-9 (citations omitted).

In challenges to state convictions under § 2254, only the legal sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), need be satisfied. Under this standard, a federal court must consider whether, viewing all the evidence, direct and circumstantial, in the light most favorable to the prosecution, any rational trier of fact could have found the existence of facts necessary to establish the essential elements of the offense beyond a reasonable doubt. *Id.* A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *McDaniel v. Brown*, ___ U.S. ___, 130 S. Ct. 665, 673 (2010) (quoting *Jackson,* 443 U.S. at 326); *see also Schlup v. Delo,* 513 U.S. 298, 330 (1995) ("The *Jackson* standard . . . looks to whether there is sufficient evidence

which, if credited, could support the conviction"). Reconciliation of conflicting testimony is within the exclusive province of the jury. *United States v. Barksdale-Contreras,* 972 F.2d 111, 114 (5th Cir. 1992). Having conducted an independent inquiry as to sufficiency under the *Jackson* standard, the appellate court's disposition of the legal sufficiency-of-the-evidence claim was not objectively unreasonable and appears consistent with *Jackson.*

### *(4) Ineffective Assistance of Counsel*

Jolley claims his trial counsel was ineffective by failing to (1) request a proper accomplice-witness-rule instruction, (2) request a lesser included offense instruction, (3) file a motion for continuance so that service could be made on the defense's expert to testify on the issue of which knife was used in the stabbing, (4) secure a polygraph test on Jolley where the state offered to dismiss charges if he passed the test, (5) discuss plea bargain offers made by the state, (6) review the 911 tape prior to trial, (7) visit the location where Taylor set fire to the victim's truck and hid his bloody clothes, and (8) present mitigating evidence during the punishment phase of his trial. (Pet. at 7C-7I, 8)

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Strickland v. Washington,* 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland,* 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id.* at 668, 688-89. Judicial scrutiny

of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689.

The state habeas judge, who also presided over Jolley's trial, conducted a hearing by affidavit. In her affidavit, counsel testified, in part, as follows:

> It is my belief that I rendered the Applicant effective assistance of counsel during the course of my representation of him. Trial strategy played a big role in how the case would be tried. It was our defense in this case that the Applicant was not the murderer, Brian Taylor was. We felt the 911 tape aided us in this defensive theory. I spent countless hours reviewing the evidence, visiting the crime scene, interviewing witnesses and conferencing with the Applicant regarding the defense in this case. The family members and friends that we had present in the courtroom for the punishment phase all backed out and would not testify when the time came. This information was discussed with the Applicant before we began the punishment phase. The Applicant elected to testify during his punishment phase in an attempt to demonstrate to the jury that they had made a mistake by finding him guilty. The Applicant insisted on testifying during the punishment phase to tell his version of the facts. His testimony was the only mitigating evidence we had.

(State Habeas R. at 315-315E) Counsel further testified that she made objections to the jury charge and requests for jury instructions off the record, that Jolley, himself, chose not to take a prescheduled polygraph test, that there were no plea offers by the state in the case, that she reviewed the 911 tape and played the 911 tape for all the witnesses she spoke with, that she filed a timely motion for continuance on the grounds that their expert would be unavailable on the date trial was set to start that was denied by the trial court (Clerk's R. at 260), and that she did visit the area where Taylor set fire to the truck and hid his bloody clothes but did not find any clothing which was conveyed to Jolley. (*Id.*)

Based largely on counsel's affidavit, the state habeas court entered detailed findings of fact refuting Jolley's allegations of ineffective assistance. (State Habeas R. at 324-41) Applying the *Strickland* standard to its factual findings, the state court concluded Jolley had failed to demonstrate

that counsel's representation fell below an objective standard of reasonableness or that but for counsel's alleged acts or omissions, the result of his trial would have been different. (*Id.* at 343-50)

The state habeas court found counsel's affidavit credible, and Jolley's assertions incredible. Such credibility determinations are entitled to deference, absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Galvam v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002); *Carter v. Collins*, 918 F.2d 1198, 1202 (5th Cir. 1990). Jolley presents nothing to rebut the presumption of correctness of the state's court's factual findings. Thus, applying the appropriate deference to the state's factual and credibility determinations, the state courts' decision denying Jolley's ineffective assistance claims is not contrary to or involve an unreasonable application of *Strickland*. Jolley presents mostly conclusory allegations in support of his claims of ineffective assistance of counsel. Such allegations are insufficient to raise a constitutional issue or demonstrate prejudice. *United States v. Holmes*, 406 F.3d 337, 361 (5th Cir. 2005); *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998).

*(5) Evidentiary Hearing*

Jolley complains that the trial court's factual findings were made without an evidentiary hearing. A full and fair hearing, however, does not necessarily require live testimony. *Clark v. Johnson*, 202 F.3d 760, 766 (5th Cir. 2000). The Fifth Circuit has repeatedly found that a paper hearing is sufficient to afford a petitioner a full and fair hearing on the factual issues underlying the petitioner's claims, especially where, as here, the trial court and the state habeas court were one in the same. *Id.* Furthermore, § 2254(e)(2) provides:

> (e)(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–

> (A) the claim relies on–
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Jolley has not met the statutory criteria. The case can be decided on the record, and the interests of justice do not require a hearing. Further development of the record is not necessary in order to assess the claims.

## II. RECOMMENDATION

Based on the foregoing, it is recommended that Jolley's petition for writ of habeas corpus be denied.

## III. NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The court is extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation until June 30, 2010. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is

found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## IV. ORDER

Under 28 U.S.C. § 636, it is ordered that each party is granted until June 30, 2010, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation. It is further ordered that if objections are filed and the opposing party chooses to file a response, a response shall be filed within seven (7) days of the filing date of the objections.

It is further ordered that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED June 8th, 2010.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE